Filed 12/4/25  P. v. Salcida CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY SALCIDA,<br><br>    Defendant and Appellant. | E083401<br><br>(Super.Ct.No. RIF1805353)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Matthew C. Perantoni, Judge.  Reversed.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Anthony Salcida[1] lived in a house located on Jasper Loop in Eastvale (Jasper Loop house) with several other people. Defendant warned those living in the house that if they were with anyone he had ever dated, he would kill them. The victim, Alicia L., lived with defendant and knew the rules. Defendant once had a relationship with Vincent Romero and Romero eventually moved into the Jasper Loop house. Despite defendant's warning, Alicia began a relationship with Romero and they eventually married.

At the beginning of November 2018, Alicia and Romero were robbed at a park-n-ride in Corona. Several weeks later, they were sitting in Romero's truck outside his parents' house when a car pulled up and several men, at least one with a gun, emerged from the car. Romero and Alicia were able to drive away. During these two incidents, defendant was in constant contact with Kenyatta K. Crockett[2], and Crockett was nearby during these incidents based on cellular telephone records and GPS trackers that had been placed in the vehicles of Alicia and Romero by defendant.

On November 24, 2018, Alicia returned from work to the Jasper Loop house. She took a quick shower and then left to meet up with Romero. During this time, defendant

---

[1] Defendant also used the names Courtney, Veronica Lopez and Angel, and sometimes identified as a woman. In the opening brief, defendant is identified as "she." The trial court agreed to refer to defendant as "Miss" during the trial after confirming with defendant that was preferred. Defendant confirmed being a biological male. The reporter's transcript refers to defendant as he and she. This court will refer to defendant as a male for purposes of this opinion.

[2] Crockett and defendant were both charged in the information but were tried separately.

2

contacted Crockett. Crockett, his cohort or a coconspirator, confronted Alicia outside her home and shot her six times resulting in her death. Defendant transferred $2,500 to Crockett after the murder, which was an amount discussed in text messages as to what it would cost to "fuck" up a girl. Crockett was eventually arrested for driving a stolen car; ammunition matching the casings found at the shooting of Alicia was found in his car.

Defendant claims on appeal that (1) the evidence is legally insufficient to support his first degree murder conviction and true finding on the lying in wait special circumstance; and (2) the trial court erred by instructing the jury on conspiracy, instructing the jury that it could rely on an overt act that occurred after Alicia's murder requiring reversal of his conviction.

## PROCEDURAL HISTORY

Defendant was found guilty on October 12, 2023, of the first degree murder of Alicia L. (Pen. Code, § 187, subd. (a))[3] and the special circumstance of lying in wait within the meaning of section 190.2, subdivision (a)(15). Defendant was sentenced to state prison for life without the possibility of parole.

## FACTUAL HISTORY

A.    THE JASPER LOOP HOUSE

Daisy L. was Alicia's sister. She lived in the Jasper Loop house before Alicia died, with defendant and several other persons. Alicia, Daisy[4], and Stephanie L., who

---

[3] All further statutory references are to the Penal Code unless otherwise indicated.

[4] We refer to some witnesses by their first names for clarity due to shared last names (Cal. Rules of Court, rule 8.90(b)). No disrespect is intended.

were all sisters, were living in the Jasper Loop house in November 2018. Alicia had a daughter who also lived in the house. Carlos Behena also lived in the house and had a relationship with defendant.

Daisy had lived with defendant since she was 17 years old. Daisy worked two jobs and eventually got a bank account that was linked to defendant's account. He had full access to her money. If she needed money, defendant would go with her to buy things. Daisy was afraid of defendant because he was sometimes mean to her and other persons in the house. Defendant had pushed her once. She and Stephanie had observed defendant hit Alicia when Alicia tried to move out. He was in control of everyone in the Jasper Loop house. They all paid him rent and gave him money for bills. She tried moving out and living on her own but she could not make it and had to move back in. When she moved back in, defendant told her that he knew where she had worked and her bus route. He had her followed by a person named Blacky. Daisy and Stephanie later found out that "Blacky" was Kenyatta Crockett. Stephanie had met Crockett several times when she had accompanied defendant. Crockett called defendant Angel or Ver Low.

Stephanie indicated that defendant bought her a cellular phone but required her to share her location with him at all times. He also had full access to her bank account. She could only spend money if defendant approved.

Vincent Romero was also living in the Jasper Loop house. Romero met defendant online. Defendant identified himself online as Veronica Lopez. Each time they met in person Romero was forced to wear a blindfold. Romero eventually fell in love with a

4

person he thought was a girl named Veronica. He then met in defendant in person; defendant claimed to be Veronica's cousin and was dressed as a woman. Defendant identified himself as Angel. Defendant convinced Romero to move in with him. Romero initially believed defendant was a woman. Romero lived with defendant for several years. He stayed with defendant because he believed that at some point he would be introduced to Veronica. Romero shared a room with defendant..

Romero began having romantic feelings for Alicia. They started a relationship but initially kept it a secret from everyone in the Jasper Loop house. Romero married Alicia on October 26, 2018. Romero helped raise Alicia's daughter; defendant had recommended to Romero that he be a father figure for the daughter. Romero moved out of the Jasper Loop house and into his mother's house prior to Alicia's shooting. Romero did not recall that he had to give defendant control of his money.

Daisy and Stephanie were worried about Alicia being with Romero because everyone in the house knew that they were not to have relationships with defendant's boyfriends. Defendant had threatened Daisy when she first moved in that she was not to touch his men or "you'll die." Defendant was shocked and angry when he found out about Alicia and Romero. Alicia also wanted to move out but defendant threatened to take her daughter from her. Stephanie indicated that defendant was upset about the relationship between Alicia and Romero when he first found out, but about three weeks leading up to Alicia's death, he had a change of heart. It seemed odd to Stephanie that he was no longer upset.

5

Defendant purchased a GPS tracking device and had Daisy register it. Daisy observed defendant put the tracker in Romero's truck. Daisy also was aware that defendant purchased another tracking device for Alicia's car. Daisy did not think it was unusual because they all had tracking applications on their phones, and she was also concerned, so she wanted to keep track of Romero and Alicia. She paid the monthly fee on the trackers. Defendant told Daisy not to tell the police about the tracking device. Stephanie was aware that defendant had put a tracker on Alicia's car prior to her murder.

Christina L. was another of Alicia's sisters. She never lived in the Jasper Loop house. Christina knew defendant as a family friend. Alicia had moved in with her after living at the Jasper Loop house. Many times defendant would drive by her house. He also sent threatening text messages to Alicia. During the time that Alicia lived with her, defendant made numerous calls to child protective services reporting both her and Alicia. Christina wanted her sisters to move out of the Jasper Loop house but they were too afraid of defendant.

Alicia's sister, Maria Gonzalez, had also lived in the house with defendant, Behena, Romero, Stephanie, Daisy, Alicia and Alicia's daughter. Gonzalez stated it was hard living with defendant because he was aggressive and manipulative. Gonzalez worked part time but defendant would take all of her money. Defendant wanted her to download a location-sharing application on her phone but she refused.

B.     PARK-N-RIDE INCIDENT

Three weeks prior to Alicia's murder, Romero and Alicia were at a park-n-ride parking lot in Corona off Main Street at nighttime. They had both cars at the location but

6

were sitting in Romero's truck. While they were still in the truck, they observed two Black males approach Alicia's car. Romero got out and told the men to get away from Alicia's car. They apologized and claimed to be looking for a similar car that belonged to their boss.

Suddenly, one of the men pointed a gun at Romero. Alicia was still inside the truck in the backseat. Romero was instructed to get into the truck and the man got in with him. Alicia, Romero and the gunman all sat in the backseat of the truck, and the other man got into the driver's seat of Romero's truck. The man in the backseat held a gun to Romero's leg. The man drove the truck and parked in a cul-de-sac off Joy Street approximately one mile from the park-n-ride. They took Alicia's phone, purse and wallet. The men also took Romero's phone and his keys.[5] They told them that this was a message from "Mike."[6] Romero and Alicia were then driven back to the park-n-ride. The two men got into a waiting car. Alicia was able to track her phone. She found it up the street from the Jasper Loop house at a school. Romero and Alicia never called the police because they had been threatened not to call the police.

On the night of the park-n-ride incident, defendant called the police and reported that Alicia was missing. He called the police on a phone with the number (951) 741-4641. He reported that Alicia was his 26-year-old daughter and that she was supposed to be home at 2:00 a.m. but was still not home. He told the dispatcher that her ex-boyfriend

---

[5] Romero had an extra set of keys he was able to use to drive his truck home.

[6] Alicia reacted to the name and Romero later found out that Mike was her previous boyfriend, Michael Carney.

7

had been threatening to kill her. She was not answering her cellular telephone. Sometime later, defendant called back and reported that Alicia had returned home.

Daisy was aware of the incident at the park-and-ride occurring before Alicia's death. Defendant had told her that Alicia had been robbed at gunpoint and all of her belongings were taken. Defendant told Daisy he believed that Carney, Alicia's ex-boyfriend, was involved in the robbery. Defendant also told Daisy that Carney had been abusive to Alicia. Before her death, Alicia never told Daisy that Carney had been abusive or threatened her.

### C.    BRANDISHING A WEAPON AND CAR CHASE

Two weeks prior to the murder, late in the evening on November 19, 2018, Alicia wanted to talk with defendant about her moving out with Romero. Romero drove Alicia to a Starbucks off Sixth Street in Norco. Romero parked his truck nearby and Alicia got into defendant's car. Alicia spoke with defendant for a long time. Romero texted her that he needed to leave because he had to work the next morning. Romero and Alicia left the Starbucks and drove to Romero's parents' house in Corona where he was staying. Alicia was driving his truck. When they parked in the driveway of the house, another car, a white Nissan Sentra, pulled up near the house. It had only dealership plates. At least three people got out of the car. Romero saw that at least one of them had a gun. Romero told Alicia to drive. The people got back in the Nissan and followed them.

Romero called 911 while they were trying to get away. He told the dispatcher that he and Alicia were being followed and the people had guns. He stated they were at Sienna and Harley Streets in Corona and that there were three Black males in the white

8

Nissan car following them. Alicia lost the Nissan and they stopped on Stoneberry Street. Romero testified that one of the men in the Nissan that arrived at his parents' house on Suffolk Street looked like the man holding the gun at the park-n-ride. Alicia was on the phone with defendant during the chase. Defendant arrived at Stoneberry Street while the police were still with Alicia and Romero. When they talked to the police, Romero described the vehicle following them as a white Nissan. Defendant, however, told the police, "Probably a Kia. Black people don't drive Nissans." Alicia got her car from Romero's parents' house and then went back to the Jasper Loop house.

Around 5:00 a.m., the following morning, someone came to Romero's house and started banging on the door with a rock. He peeked out the window and saw the same white Nissan. The person hit his work truck with a rock. There was only one person, whom Romero identified as Crockett.

D.     ALICIA'S SHOOTING

Adil Mujtaba lived across from the Jasper Loop house on November 24, 2018. In the evening, around 8:00 p.m., he was standing in his driveway. He observed a woman come out of the Jasper Loop house and get into her car. A person approached her car from behind and shot into the driver's side of the car approximately six times. The shooter ran back to where he had come from. The female opened her door and collapsed on the ground. Mujtaba went to try to help the female. Nobody came out of the Jasper Loop house to help. Someone opened their front door and looked out but no one came out to assist the woman. Video surveillance from his home was shown to the jury.

9

Daisy was in the Jasper Loop house on the night of the shooting. Daisy was with Stephanie in the living room. Behena and defendant were in their bedrooms. A "minute or two" after Alicia left, Daisy and Stephanie heard gunshots outside. She and Stephanie went toward the front door. Defendant came down the stairs and told them, "[t]hey shot Alicia." Daisy and Stephanie indicated that from defendant's room, he would not be able to see outside to the front of the house where Alicia was shot. Daisy and Stephanie grabbed Alicia's daughter and hid in the laundry room. Daisy called the police. Daisy was afraid to go outside; defendant told her not to go outside. Stephanie did not go outside because defendant was standing by the front door and she was afraid to try to get past him.

At 8:09 p.m. on November 24, 2018, Riverside County Sheriff's Corporal Wayne Turner was dispatched to the Jasper Loop house after a report of shots being fired and a woman being shot. He was the first law enforcement to arrive and observed several people standing by a car; Alicia was lying on the ground. Alicia had a very faint pulse but passed away soon after he arrived. Corporal Turner had a body-worn camera and the footage was shown to the jury.

Riverside County Sheriff's Investigator Joshua Manjarrez was assigned to investigate the case. He walked through the crime scene. Alicia was lying on the ground with her shirt open. He found six expended nine-millimeter FC Luger shell casings. The driver's side window was shattered. The car was impounded and a GPS tracker was found in the car. Investigator Manjarrez surmised a semiautomatic weapon was used based on the casings that were expelled.

10

## E.  INVESTIGATION

Corona Police Detective David Dopson arrested Crockett on December 4, 2018, while he was driving a white Nissan Versa.  The Nissan came back as stolen and Crockett was arrested.  The Nissan was impounded and sent to a Nissan dealership.  A box of nine-millimeter FC Luger ammunition rounds was found in the trunk of the Nissan.  The Nissan had paper plates.  Investigator Manjarrez went to the dealership.  The nine-millimeter ammunition had the same types of shell casings found at the scene of Alicia's murder.  Someone came to the dealership looking for their belongings in the car.  Video surveillance was obtained and the person was Crockett.  There were also several items bearing Crockett's name found in the Nissan.

Romero's truck was searched.  A GPS tracker was found under the front passenger's seat.

Daisy moved out of the Jasper Loop house after the shooting.  Just prior to moving out, she heard defendant on the phone with someone.  He kept saying, "don't say anything."

Riverside County Sheriff's Investigator Jose Vasquez interviewed Michael Carney.  Carney gave his cellular telephone to Investigator Vasquez and all of the data was downloaded.  There were no calls between Carney and Crockett or defendant.  The last call between him and Alicia was in May 2018.  Carney was a truck driver and he provided a bypass log that showed where his truck was on each day when it passed through certain checkpoints.  On November 9, 2018, the date of the park-n-ride incident, he was not in Riverside County.  On November 20, 2018, the date of the brandishing, he

11

was driving through Arizona and New Mexico. There was no bypass log for November 24, 2018, and Carney was believed to be in Riverside County. Based on Carney's phone records, he was not near the shooting scene. Carney did not have Textnow or Talkatone[7] applications on his cellular telephone, which could be used to have another Internet phone number.

On the day of her murder, Alicia had been working on Binnacle Drive in Dana Point. There was a photograph of Alicia's work address on Crockett's phone. On a phone found on defendant's person, there was a screenshot of the Binnacle Drive location.

On November 26, 2018, two days after the shooting, defendant transferred $2,500 from a bank account belonging to him and Stephanie to Crockett's bank account. There were additional funds sent to Crockett on December 15, 2018.

The GPS trackers found in the cars belonging to Alicia and Romero were registered to the Jasper Loop address. Defendant spoke about a life insurance policy that Alicia might have. He wanted to get it from Alicia's work as soon as possible after her murder. Defendant tried to control Alicia's funeral. The cause of Alicia's death was multiple gunshot wounds.

---

[7] "TextNow is a . . . communication application that allows texting and calls. It assigns a phone number to the user account when it's set up, and that is the phone number that is displayed when text messages are sent to other users as a contact, as opposed to the carrier's phone number that's [assigned] to the phone. [¶] TextNow also allows the user of that account to sign in on multiple devices, multiple phones, or computers via a web interface, and have their messages synchronized across multiple devices." Talkatone is a similar application.

The remainder of the evidence involved messages on several phones and phone numbers belonging to defendant and Crockett. It also involved the GPS trackers in the cars belonging to Romero and Alicia. Investigator Vasquez confiscated the cellular telephones from the occupants of the Jasper Loop house. Defendant called 911 on the night of the shooting from the Jasper Loop house at 8:09 p.m. The phone number he used was (909) 332-0199 (ghost phone). Defendant had given Investigator Vasquez another cellular telephone on the night of the shooting. On the call, defendant stated that someone had been shot outside his house and the shooting was still happening. He also stated that his daughter Alicia had been shot. He said that she had been having trouble with her boyfriend, "Michael." Defendant's statement that the shooting was still happening during the 911 call contradicted Mujtaba's testimony that it was a quick six shots. Defendant was arrested on December 17, 2018, and the ghost phone was found on his person.

The ghost phone was a Samsung Galaxy S9 Plus. Defendant attempted to open the phone in front of Investigator Vasquez. He entered an incorrect code several times until it locked. Defendant told Investigator Vasquez that he did not want them to see his phone because of intimate images of him and Behena. The phone was locked for several years but was finally able to be opened to check the data in 2020. The ghost phone had an application that allowed it to monitor GPS tracking devices. One of the trackers was the one in Alicia's car. On the ghost phone were photographs of debit cards belonging to Crockett. No explicit images were found on the phone.

13

There was a phone number on the ghost phone of (213) 248-1637, which was associated with the initials K.K.C. These were Crockett's initials. Crockett's phone was found on him and it was a Samsung S7 Edge (Crockett's phone). It had a phone number of (213) 248-1637. Messages between Crockett's phone and the ghost phone were obtained. Both the ghost phone and Crockett's phone had the Textnow application, which was a texting application and they both used an Internet phone number of (951) 842-5174 (mutual phone number).

Investigator Vasquez monitored a jail call from Crockett to defendant. Defendant asked Crockett, "what did they get you, for?" Crockett responded, "Um, a stolen car, checks." Defendant stated, "That's all?" Crockett stated, "Well, for now, but I mean I don't know they have car, but." Defendant asked, "Was there other stuff in the car?" Crockett responded that his and his mother's belongings were in the trunk. Crockett insisted that he refused to talk to the police who stated there were several open cases on him. Defendant offered to loan him the bail money.

Another call from jail was made by Crockett to a female. Crockett stated his bail was $10,000 and he needed a cosigner. Crocket told the female to call "Marie"[8] and gave her the Textnow mutual phone number. There was no answer. He then told her to call (909) 332-0199, which was the phone number on the ghost phone. Defendant answered the phone. Crockett told defendant that the bail was $10,000. Defendant told Crockett he

---

[8] Marie was another alias used by defendant.

would try to work it out.  Veronica Lopez bailed out Crockett.  The amount was $2,000.  The identification used belonged to defendant.

In reviewing the records for Alicia's phone, she was receiving threatening messages from a Textnow phone number, (323) 609-8097 (the 323 number).  Investigator Vasquez obtained all of the records for this phone number.  Messages were sent from the number to Alicia's phone on November 8, 2018, calling her "shit crazy" and that she was going to be gone.  There was also a message that "Mike" wanted to speak with her.  She responded that she did not recognize the number and that if Carney wanted to talk to her he should call from his own phone.  Another text was sent from the phone to Alicia, "He be trying to finna call you and you got my [N] on blocked."  There was an exchange of messages that Carney had been the one who decided not to talk to her.  A text was sent from this Textnow number to Alicia stating that Carney loved her and wanted to give her a ring but she responded that he was already married.  The Textnow number sent a message that Carney was no longer with his "baby mama," but she responded that he still lived with her.  There were threatening messages about knowing where Alicia lived and that she should "be on alert.  Real talk."  The person also stated, "You be walking dead."

The 323 number—which sent threatening messages to Alicia's phone—also sent text messages to the mutual phone number, which was the Textnow number connected to defendant and Crockett on November 9, 2018, the day of the park-n-ride incident.  Crockett had another number (714) 253-4415 (Talkatone number), which was a Talkatone number connected with defendant's email address and cellular telephone number.  The 323 number also sent messages to this Talkatone number.  There were

15

other phones that used this Talkatone number but were connected to defendant's email address and used a name connected to Crockett—Mumble.

There were messages sent between the 714 area code Talkatone number and the mutual phone number that appeared on phones belonging to Crockett and defendant. On November 8, 2018, at 10:01 p.m., there was a message from the 714 Talkatone number to the Textnow number. First was "Hola," and then "Mumble." There were messages from the mutual phone number to the Talkatone number. Crockett's Textnow number sent a message at 10:40 p.m. on November 8, 2018, the night of the park-and-ride incident, to the 714 Talkatone number. The message said "Mumble here" and that they were just waiting in the car. There was a response message, which asked about whether there were two cars or one and if they should take "two." The person responded that they were going to call him. There was a phone call between defendant's ghost phone and Crockett's phone at 10:43 p.m. There was a message sent at 11:27 p.m. on November 8, 2018: "Don't forget, take everything and hide the phones somewhere." A response at 11:59 p.m. on November 8 stated "Four minutes away." Another message asked, "Still there," and then several times, "cut the eyes." On November 9, 2018, at 12:05 a.m. a message was sent that "they" were not there, and response message sent to "Just chill for a minute. They're parked somewhere." There were messages sent at 12:18 a.m. "still there."

Several hours later, Alicia sent a message to the 323 number, which had sent the threatening messages to her. She asked for her wallet back. The response referenced that they now knew where Romero lived and that "Shit not over." Alicia texted, "WTF.

16

What is your problem?" The response was that Romero had screwed up and they could still find her even though they switched cars. The messages referred to Carney and that she was supposed to be with him and not Romero. A message was also sent stating, "You dead walking now, bitch."

All of the call records and data were provided to a crime analyst, Sharae Hill. She had received training on mapping out cell phone towers and how data is sent to the towers to determine the location of a cellular telephone. She analyzed call detail records for defendant, Carney, Alicia and Romero. She was also given GPS tracker information from the cars belonging to Alicia and Romero.

Hill analyzed the records between November 8 to November 9 for the park-n-ride incident. On November 8, 2018, at 11:20 p.m., Romero's truck was at Stagecoach Park in Corona until 12:04 p.m. At 12:05 a.m., Crockett's phone was approximately one mile from Romero's location. There was a call with defendant's ghost phone at 12:11 a.m. From 12:26 a.m. to 1:07 a.m., Romero's truck was at the park-n-ride. Crockett's phone was nearby and received a call from the ghost phone. Between 2:13 a.m. and 3:30 a.m., Romero's tracker showed he went to several places including Joy Street and Romero's home. It was stationary from 2:13 a.m. until 2:18 a.m. Carney's phone was not near the incident. There were several other calls between Crockett and defendant (on the ghost phone) during the evening of the park-n-ride incident. Crockett only made or received calls from the ghost phone that evening.

Hill analyzed the records from November 19, 2018, at 6:00 p.m. until November 20, 2018, at 6:00 a.m., which was the date of the brandishing incident. Carney's cellular

17

telephone was in Texas. Alicia's car was at Romero's residence from 6:35 p.m. until 2:49 a.m. Romero's truck was at his residence from 12:01 a.m. until 12:08 a.m.; it left at 12:09 a.m. and ended up on Stoneberry Lane. Crockett's cellular telephone showed up prior to 12:08 a.m. at places where Romero's truck was located. Crockett received a call from the phone (909) 332-0199 at 10:59 p.m. and 11:48 p.m. Crockett's phone was near the Starbucks at 10:59 p.m. on November 19, 2018, where defendant and Alicia were talking prior to the brandishing incident. Crockett's phone was near Romero's residence between 5:33 a.m. and 5:36 a.m. on November 20, 2018. This was at the time of the vandalism incident near Romero's residence.

On November 24, 2018, at 6:00 a.m., Alicia drove from the Jasper Loop house to Dana Point. She was there until 6:49 p.m., and she returned to the Jasper Loop house at 7:52 p.m. From 1:47 p.m. to 2:28 p.m., Crockett's cellular telephone pinged off a tower in Dana Point about one-half mile from Alicia's car. At 7:46 p.m., it registered at the 91 freeway and La Sierra. At 7:54 p.m., it was near River Road and Second Street by the 15 freeway in Corona. This was 3.1 miles south of the Jasper Loop house. Crockett was near the Jasper Loop house at 7:54 p.m., the time of the homicide. He was on the phone from 7:54 p.m. until 8:05 p.m. with defendant's ghost phone. Carney's cellular telephone never registered close to the Jasper Loop house. There was a call between Crockett and the ghost phone at 8:38 p.m. Crockett's phone was in Norco. At 10:54 p.m. Crockett's phone was northbound on the 15 freeway heading towards Las Vegas. At 7:53 p.m., Romero's truck was at his residence and he arrived at the Jasper Loop house at 8:16 p.m.

18

There was also a record of text messages between defendant's ghost phone and Crockett's phone. Defendant sent a message to Crockett on November 5, 2018, to get everything ready for Friday, Saturday or Sunday; the day of the park-n-ride incident, November 9, 2018, was a Friday. Crockett sent messages about meeting with a person named Dodge to discuss the details with him. Crockett sent a message that he was meeting with Dodge and one other person. On November 8, 2018, at 5:03 p.m., defendant sent a message to Crockett, "You're be okay tonight." On November 9, 2018, at 3:52 a.m. an image of Alicia was sent by defendant to Crockett. It was a photograph of her hand. One of her nails was broken. Defendant sent a message to Crockett, "Only broke a nail. She's perfectly fine. Fucked up." Defendant asked Crockett to call him. Defendant texted Crockett at 11:26 a.m. on November 9, 2018, "Let me know when you're not busy. I got a plan." On November 10, 2018, at 4:37 a.m., Crockett asked defendant if Romero had moved in with him and he responded, "Fuck no." There were messages back and forth that they loved each other.

Crockett also deleted all calls between him and the ghost phone from October 22, 2018, and November 27, 2018, but they still appeared in the records. All calls on the ghost phone were deleted from the dates October 22, 2018, until November 11, 2018.

Crockett sent messages to defendant on November 16, 2018, that he was meeting with several people. This was around the time of the brandishing incident. Defendant responded, "Oh, okay, good. Yeah, be straight up. Don't hold back. We need shit done." On November 18, 2018, at 12:16 p.m., Crockett texted defendant that someone should be getting the car that night. At 11:28 p.m. on November 19, 2018, defendant

texted Crockett that they were "here talking," which was the same time that Romero testified he and Alicia were at the Starbucks with defendant. At 11:29 p.m., defendant texted to Crockett, "Hurry up." Crockett responded he was 20 minutes away. The 911 call by Romero regarding the brandishing incident was at 12:05 a.m. Crockett texted defendant at 3:38 a.m. on November 20, 2018, "We are home. Everything is good." Crockett's phone pinged off of cell phone towers near Romero's parents' house between 5:29 a.m. and 5:33 a.m. During this time, there were several phone calls between Crockett and defendant. On November 20, 2018, Crockett texted defendant that he had him saved as Maria on his phone to obscure his identity.

There were several calls and text messages between defendant and Crockett on November 24, 2018, the day of the murder. There were several calls between defendant and Crockett while Crockett was parked near Alicia's work in Dana Point. Based on the calls, Crockett was driving all around the area near the house where Alicia was a caretaker, but it was a gated community that could not be accessed without permission.

There was an 11-minute call between defendant and Crockett at 7:54 p.m. the night of the murder. Based on video surveillance in the area of the shooting, defendant appeared in the doorway of the Jasper Loop house during this time and appeared to have a cell phone in his hand. Defendant never went out to help Alicia. It was clear that the shooter was already gone but defendant never went out to assist her. He closed the door. Defendant opened the door again a few minutes later; he was still on the phone.

After the murder, defendant and Crockett each texted if each other was "good." There was no discussion that Alicia had been shot at the Jasper Loop house. They texted

20

each other several times while defendant was at the police station but there was no mention of the murder. They exchanged text messages about Las Vegas and defendant's favorite taco place in Las Vegas. On November 25, 2018, Crockett texted that he felt that something was wrong and asked defendant if he was sure he was good. Defendant responded that he was fine. In the early morning hours of November 26, 2018, Crockett texted defendant, "What's going on. I feel weird. Now you ignore me all day. You don't respond. What's going on?????. OMG, can you call me? It's an emergency, Ver Low. Call me please ASAP. It's an emergency." On November 26, 2018, defendant sent a text to Crockett, "Sent the money, now pay your car payment and bail stuff and insurance." A note was found on the ghost phone belonging to defendant that stated, "License suspended, $55 insurance past due, $400 Chrysler Capital, $1,800, two months due, bail bonds $1,800 three months past due, court case $4,600, behind eight months, Oz, Pueblo, D Mack, Dejay, $3,800 paid Blacky, taking the most risk, and in the most debt." Blacky referred to Crockett.

There were messages on Crockett's phone the day after the brandishing incident from someone about police pressing charges and not willing to do jail time. There was a screenshot on Crockett's phone created on November 22, 2018, two days prior to Alicia's murder, of a bus ticket from Las Vegas to Riverside on November 28. Defendant sent Crockett a photograph of Alicia. Defendant sent several messages to Crockett after the murder about not being able to sleep. Crockett texted defendant on December 17, 2018, at 4:00 a.m., "Police are here." There was a call at 4:00 a.m. from Crockett to the ghost phone.

21

A web search history was performed on Crockett's phone. Between November 26, 2018, and November 29, 2018, Crockett searched Eastvale news for a deadly shooting of a woman and his own name. He also searched for hotels and bus schedules in Las Vegas. He also searched for a nine-millimeter handgun.

There were several messages received and sent on the Textnow number associated with Crockett and defendant. On November 12, 2018, there was a message asking someone if they had "pieces for sale." Another message, "45 or 9," was sent to several numbers. In Investigator Vasquez's experience, this referred to a 45-caliber or nine-millimeter firearm. A nine-millimeter gun was used to shoot Alicia.

A message was sent from the Textnow number belonging to defendant and Crockett, asking, "Would you fuck [up] a female for $2,500?" and the response from a person named Tori was, "Hell, yeah." This $2,500 amount was what was transferred from defendant to Crockett after the murder. A message was sent, "Do you got any pieces on you." The person responded that it would take a day or a week to get one. There were other messages sent trying to get a gun. There were messages sent on November 30, 2018, asking if somebody "needs to buy a throwaway." Investigator Vasquez stated that a throwaway was either a phone or gun that someone wanted to dispose of.

G.    DEFENSE

Defendant testified on his own behalf. He had been family friends with all of Alicia's family. He, his mother, Alicia, Stephanie, Daisy, Romero and Behena all paid the rent for the Jasper Loop house. They all signed the lease. They all each paid $500

22

each month for food, utilities and cellular telephones. He insisted that Romero had always lived in the Jasper Loop house. Behena was supporting defendant. Defendant kept the house stocked with food for everyone.

Defendant was very close to Alicia and he helped care for her daughter. Romero wanted to be a father so defendant suggested he become Alicia's daughter's father. It was obvious to defendant when Alicia and Romero started dating. Daisy liked Romero and she was the one who suggested they get trackers for the cars belonging to Romero and Alicia. Daisy wanted to see if Alicia was still seeing Carney.

Defendant admitted he had the ghost phone. Defendant sent $2,500 to Crockett for his bail bond and a car payment. Crockett was just a friend. Defendant did not go outside to check on Alicia after she was shot because he wanted to keep everyone in the house safe. The 911 dispatcher told him not to go outside. He heard the gunshots but did not know it was Alicia who had been shot since he could not see out front. He heard other shots somewhere else while talking to the 911 dispatcher.

Defendant was not upset that Romero and Alicia got married. Defendant insisted that Alicia was still seeing Carney while she was married to Romero, based on his and Daisy tracking Alicia to a location where she met up with Carney. Defendant had no reason to kill Alicia. Defendant knew nothing about Alicia having life insurance. He paid for her funeral.

Defendant spoke with Alicia when she got home from the park-n-ride incident. Alicia told him that Carney was the one who had three guys scare her and Romero.

23

Alicia and defendant went to Carney's home and took pictures of his house. Alicia called Carney and told him that he had to leave her alone or she would tell his wife.

Crockett told defendant that Carney wanted to kill Alicia because she was with Romero and she was supposed to be with Carney. Carney told Crockett to hire someone to kill Alicia. Crockett hired someone and did not do the killing himself. Crockett admitted to defendant that he and Carney conspired to murder Alicia.

Defendant admitted he shared a Textnow phone number with Crockett. He also noted that there was a message on the number about "fuck[ing] up a female" for $2,500. He also admitted he had not turned over the ghost phone initially to police. Defendant admitted Crockett was involved in Alicia's murder but was not the one who shot her. Defendant denied that he and Crockett ever shared sexually explicit messages and pictures.

Defendant admitted he called 911 to report that Alicia was missing at the time of the park-n-ride incident but then called back to say she was home. He never reported that she had been robbed at gunpoint.

Defendant stated that Carney found out where Romero lived by the GPS tracker. The GPS tracker application was only on the phones belonging to defendant and Daisy. Defendant insisted that Carney knew Daisy or that Daisy told Crockett. He never told the police that Crockett was behind the murder. Defendant stated that Daisy had a motive to kill Alicia because she liked Romero. He insisted Crockett told him that he, Daisy and Carney were all involved in the conspiracy to kill Alicia.

24

The GPS records did not show that defendant and Alicia went to Carney's house after the park-n-ride incident. He insisted that Daisy knew the password on the ghost phone. He never told investigators to have Daisy open his phone. He insisted that it was Daisy speaking with Crockett on the ghost phone during all of the incidents. Daisy took the photograph of Alicia's nail and sent it to Crockett. He insisted he never questioned the text messages sent by Daisy to Crockett.

Defendant admitted talking to Crockett while he house was being searched by the police. At that point, defendant knew that Crockett was involved in Alicia's murder but continued to talk to him. Defendant stated that he was afraid Crockett would kill him. He stated that Daisy was talking to Crockett on the ghost phone in the minutes leading up to Alicia's murder. He admitted bailing out Crockett even though he was the "murderer" of Alicia.

In rebuttal, Investigator Vasquez noted that when defendant was interviewed prior to trial, he never stated that there was a connection between Crockett and Carney, or that Daisy and Romero had a relationship.

## DISCUSSION

We first address defendant's instructional error claim as it is dispositive in this case. Defendant insists that reversal is required based on the trial court instructing the jury with the overt act of "*providing money to Kenyatta Crockett*, or another co-participant to carry out the murder." The only money that was given to Crockett was after the murder. As such, it could not support a conviction of conspiracy to commit murder. Although there were other overt acts provided in the instructions, there was no

25

unanimity requirement as to the overt acts, or a requirement of a finding by the jury on the acts. As such, it is conceivable that at least one juror relied on defendant paying money to Crockett after the murder as the overt act requiring reversal of his conviction. Additionally, although the jury was properly instructed on an aiding and abetting theory of liability, it cannot be determined if the jury relied on conspiracy or aiding and abetting in reaching its verdict. The People contend defendant waived any error by failing to object to the instruction in the trial court. In the alternative, the People concede it was error to so instruct the jury with an overt act occurring after the murder, but insist that any error was harmless beyond a reasonable doubt.

A.      ADDITIONAL FACTUAL BACKGROUND

The trial court noted that the parties had discussed the instructions off the record. There was no objection to the conspiracy instructions. The jury was instructed on conspiracy, that "The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy. [¶] To prove that the defendant was a member of the conspiracy in this case, the People must prove that: [¶] One, the defendant intended to agree and disagree with Kenyatta Crockett and/or other co-participants to commit murder; [¶] Two, at the time of the agreement, the defendant and the other alleged member of the conspiracy intended that one or more of them would commit murder; [¶] Three, . . . The defendant and/or other co-participant committed the following overt act to accomplish murder. And that overt act alleged is providing directions to Alicia [L.]'s whereabouts, assisting and obtaining a gun, provided money to

26

Kenyatta Crockett, or other co-participant to carry out the murder; [¶] And, No. 4, this overt act was committed in California."

The instruction further advised that the members of the conspiracy had an agreement and intended to commit murder. They were further advised on overt acts that "An overt act is an act by one or more of the members of the conspiracy that is done to accomplish the agreed upon crime. The overt act must happen after the defendant has agreed to commit the crime." The jurors were advised that they had to find that at least one of the coconspirators committed an overt act but they did not have to agree on which specific overt act was committed.

The jury was also instructed on aiding and abetting. They were advised that in order to find a person is guilty of aiding and abetting, it must find that "One, the perpetrator committed the crime; [¶] Two, the defendant knew that the perpetrator intended to commit the crime; [¶] Three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] And, four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime." It further instructed, "Someone aids and abets a crime if she knows the perpetrator's unlawful purpose, and she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

The jury was also instructed that it must find, after finding defendant guilty of first degree murder under a theory of lying in wait or premeditation or deliberation, whether he was also guilty of the special circumstance of lying in wait. The jury was instructed,

"If you decide that a defendant is guilty of first-degree murder but was not the actual killer, then when you consider the special circumstance of lying in wait, you must also decide whether the defendant acted with intent to kill. In order to prove the special circumstance for a defendant, who is not the actual killer, but who is guilty of first-degree murder as an aider and abettor or member of a conspiracy, the People must prove that the defendant acted with an intent to kill. [¶] If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he or she acted with the intent to kill for the special circumstance of lying in wait to be true."

In closing argument, the prosecutor stated that there was no doubt that a first degree murder occurred in the case but the jury needed to determine defendant's role in the murder. "Was [defendant] a co-conspirator or an aider and abettor or both?" The prosecutor further advised the jurors that they did not have to agree on the same theory of murder. They could decide either based on conspiracy or aiding and abetting. The prosecutor further advised, "So what are overt acts? For instance, request to purchase a gun. The payment of $2,500 to fuck up a female, providing directions to Alicia's location and her whereabouts, the verbal contract to kill. You only need to decide on one. And, again, maybe some of you believe that this is aiding and abetting, not conspiracy, or maybe both, but you only need to decide on one overt act, and you do not all have to agree on the same overt act." The prosecutor also advised, "So what's the difference between aiding and abetting and conspiracy? Aiding and abetting requires assisting, encouraging, promoting or facilitating the killing. Conspiracy is an agreement

28

for someone to kill Alicia and to commit—that somebody commits, at least, one overt act towards that purpose."

   2. *WAIVER*

 Defendant's counsel did not object to the instructions on conspiracy in the trial court.  Normally, when a defendant does not raise an objection at trial, he has forfeited the issue.  (*People v. Navarette* (2003) 30 Cal.4th 458, 515.)  Defendant states the issue is not waived based on the instruction being a breach of the trial court's instructional duty, which cannot be waived, and that his substantial rights were affected.  "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was."  (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)  We find that defendant's failure to object in the lower court to the instruction does not waive the issue on appeal as it affects his substantial rights.

 B. ANALYSIS

 "A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy."  (*People v. Jurado* (2006) 38 Cal.4th 72, 120 (*Jurado*); see also *People v. Ware* (2022) 14 Cal.5th 151, 163.)  Conspiracy to commit murder, "requires proof of an agreement to commit murder, an overt act by one or more of the conspirators [citation],

29

and the commission of murder or attempted murder (of the intended murder victim) by a coconspirator in furtherance of the conspiracy." (*People v. Richee* (2025) 111 Cal.App.5th 281, 294.) "The mental state required for conviction of *conspiracy* to commit murder necessarily establishes premeditation and deliberation of the target offense of murder—hence all murder conspiracies are conspiracies to commit first degree murder, so to speak. More accurately stated, conspiracy to commit murder is a unitary offense *punishable* in every instance in the same manner as is first degree murder under the provisions of Penal Code section 182." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.)

A conspiracy conviction can rest on a single overt act. (*Jurado, supra,* 38 Cal.4th at p. 122.) "[T]he jury need not agree on a specific overt act as long as it unanimously finds beyond a reasonable doubt that some conspirator committed an overt act in furtherance of the conspiracy." (*People v. Russo* (2001) 25 Cal.4th 1124, 1128.) "[T]he overt act requirement may not be satisfied by conduct occurring after the target offense is complete." (*Jurado*, at p. 122.) An act committed after the commission of an offense provides insufficient evidence to support a conviction. (*People v. Brown* (1991) 226 Cal.App.3d 1361, 1367-1370.)

The People agree that the trial court erred by including an overt act—the payment of $2,500 to Crockett—which occurred after the murder of Alicia. They contend that such error was harmless beyond a reasonable doubt. The People rely on *In re Lopez* (2023) 14 Cal.5th 562, which provides that if the "reviewing court determines beyond a reasonable doubt that any rational juror would have made the additional findings, based

on the jury's actual verdict and the evidence at trial, the error is harmless because the presentation of the invalid theory to the jury made no difference." (*Id.* at p. 589.) The People admit that the jury verdict could have been based on either the theory of aiding and abetting, or conspiracy, and that there was no unanimity requirement to decide on the theory. Further, if the jury relied on the conspiracy theory, there was no requirement that the jurors make specific findings on the several alleged overt acts. The People insist that the improper legal theory did not make a difference because the jury "could just as easily have relied" on the aiding and abetting theory to support the verdict rather than the conspiracy theory, or that the jury necessarily relied on the overt acts that occurred prior to Alicia's murder.

"It has long been established that an alternative-theory error is harmless beyond a reasonable doubt where ' "it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory." ' "(*In re Lopez, supra,* 14 Cal.5th at pp. 585-586.) "And, while 'overwhelming' evidence may demonstrate harmlessness, a court's analysis of whether the evidence is 'overwhelming' in this context is not as subjective or free-ranging as that term might imply. Instead, the analysis requires a court to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well." (*Id.* at p. 568.) "If the reviewing court determines beyond a reasonable doubt that any rational juror would have made the additional findings, based on the jury's actual verdict and the evidence at trial, the error is

31

harmless because the presentation of the invalid theory to the jury made no difference. The error did not contribute to the verdict." (*Id.* at p. 589; see also *People v. Gonzalez* (2012) 54 Cal.4th 643, 666, superseded by statute on other grounds as stated in *People v. Wilson* (2023) 14 Cal.5th 839.) "The Attorney General bears the burden of showing that the error was harmless beyond a reasonable doubt." (*People v. Hin* (2025) 17 Cal.5th 401, 444.)

This court must examine whether the jury would have necessarily found defendant guilty on a valid theory if it had based its finding of murder on the overt act that defendant paid Crockett $2,500. Here, the jury was instructed as to the overt acts as follows: (1) "providing directions to Alicia [L.]'s whereabouts," (2) "assisting and obtaining a gun," and (3) "provided money to Kenyatta Crockett, or other co-participant to carry out the murder."

It is impossible to determine on this record if the jury necessarily found together an overt act that supported the conspiracy other than the money provided by defendant to Crockett after the murder. The jury was not asked to make any specific findings on the overt acts so it cannot be determined which overt acts they found true. Moreover, they would not necessarily have to conclude that the other two overt acts were true if they concluded that defendant paid Crocket $2,500.

Moreover, the jury was properly instructed on the aiding and abetting theory of first degree murder, which was an alternative legal theory upon which to find defendant guilty of first degree murder. However, it is impossible to determine what theory the jury relied on in convicting defendant. The jurors did not all necessarily have to conclude,

based on the instructions and the argument by the prosecutor, that defendant aided and abetted the crime. Even the instructions on lying in wait provided that the jury could consider either the aiding and abetting or conspiracy theory in finding defendant guilty of first degree murder. The jurors did not necessarily have to conclude that defendant aided and abetted the murder if they found that he entered into a conspiracy to commit murder.

The People argue that "it is unrealistic to believe that the jury relied exclusively on the post-murder act to support the murder conviction under a conspiracy to the exclusion of the pre-murder acts." The People argue the evidence clearly showed that defendant provided Alicia's location to Crockett. While it is true the evidence supports the other overt acts, it is impossible to determine, based on the verdict, whether at least one juror relied on the payment of $2,500 to Crockett by defendant, to support the conspiracy theory of murder. In fact, this was strong evidence supporting that defendant was involved in the conspiracy as it mirrored the text messages found on the number shared by Crockett and defendant about how it would cost $2,500 to "fuck up" a female. It simply cannot be determined whether any one juror relied on the improper overt act. And even if they did rely on such overt act, that they necessarily found the other overt acts true, or that they also concluded that defendant aided and abetted the first degree murder rather than, or in addition to, that he entered into a conspiracy to commit murder.

The People further contend that the jury necessarily had to determine that defendant acted with premeditation and deliberation and/or aided and abetted the killer, who killed by means of lying in wait, which were concepts focused on steps taken prior to Alicia's murder. However, the jury was instructed as to lying in wait: that the jury's

33

first degree murder finding could be based on either aiding and abetting or conspiracy to commit murder. Further, the jury was instructed with an overt act that occurred after the murder, and we must presume the jurors followed the instructions. Without an unanimity finding, there is nothing in the record that supports that each juror relied on the aiding and abetting theory of murder, or only on the overt acts occurring prior to Alicia's murder.

The People also argue the fact that Alicia was murdered was sufficient evidence of an overt act to support the conviction of conspiracy to commit first degree murder, showing any reliance on an invalid theory of conspiracy to commit murder did not impact the verdict. In *Jurado, supra,* 38 Cal.4th 72, the court held that the "[c]ommission of the target offense in furtherance of the conspiracy satisfies the overt act requirement." (*Id.* at pp. 121-122.) In *Jurado*, the jury was instructed on five overt acts supporting conspiracy to commit murder, but some of these acts were improper as they occurred after the murder. However, the jury was instructed that one of the overt acts was the murder itself committed in furtherance of the conspiracy. (*Id.* at p. 121.) The *Jurado* court concluded, "Because the jury found that defendant committed the murder itself in furtherance of the conspiracy, and because substantial evidence supports that finding, the overt act requirement is satisfied. Although defendant is correct that the overt act requirement may not be satisfied by conduct occurring after the target offense is complete [citation], defendant was not prejudiced by the jury's consideration of the invalid postoffense overt act allegations, and the valid finding of a single overt act is sufficient to support the conspiracy verdict." (*Id.* at pp. 121-122.)

Further, the People rely on *People v. Padilla* (1995) 11 Cal.4th 891, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800. In *Padilla*, the jury was instructed with eight overt acts, and that it must find, in addition to a finding of an unlawful agreement and specific intent, that at least one overt act was committed. One of these overt acts alleged was the committing of the murder in furtherance of the conspiracy. A verdict form showed that the jury found seven of the eight overt acts to be true. However, the California Supreme Court found that several of the overt acts were not proper as they were "within the ambit of 'mere planning or agreement to commit a public offense' " not overt acts. However, the California Supreme Court found such error harmless beyond a reasonable doubt because the jury found the overt act true that the shooter actually did meet with the victim and killed her in furtherance of the conspiracy. This true finding by the jury on this act "clearly qualified as overt and was legally and factually sufficient." (*Id.* at pp. 964-966.)

This case differs from both *Jurado* and *Padilla*. Here, the jury was not instructed that one of the overt acts was that Crockett or another coconspirator actually met with Alicia and killed her in furtherance of the conspiracy. Moreover, even though the other overt acts were sufficient to support the verdict, the jury was not asked on the verdict form to find which overt act or acts were committed. It is impossible to determine if the jurors found the other overt acts true.

The People have not asked this court to broadly construe *Jurado* and *Padilla* to include that the commission of the act is sufficient to support the overt act requirement for conspiracy when the jury is not instructed to find such overt act true. While the

35

commission of the target offense was sufficient to support an overt act in *Jurado* and *Padilla*, in both cases the commission of the murder that was completed in furtherance of the conspiracy was listed as an overt act. We note there is no legal requirement that overt acts have to be alleged in the instructions. (*People v. Valdez* (2012) 55 Cal.4th 82, 151.) Further, the jury here was instructed that "[a]n overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be criminal—a criminal act itself." Based on the evidence, clearly the object of the conspiracy was completed—the murder of Alicia. There is no dispute that Alicia was murdered, and that it would be sufficient to support the overt act, but there was no requirement that the jury find the murder was committed in furtherance of the conspiracy as was required in *Jurado* and *Padilla.* The People provide no argument that even though such an overt act of the actual killing in the furtherance of the conspiracy was not alleged in the instructions, but other overt acts were listed, the completed crime was an overt act that supported the conviction. Based on the instructions and argument by the People, it does not seem reasonable that the jury reached its own conclusion on the overt act that the murder of Alicia was completed in furtherance of the conspiracy.[9] Further, as stated,

---

[9] In another case, *People v. Maciel* (2013) 57 Cal.4th 482, the court found, "As the object of the conspiracy was to kill [the victim], his murder satisfied the element of an overt act committed in furtherance of the conspiracy." (*Id.* at p. 518.) However, in *Maciel* it appears that no overt acts were specified to the jury, and it was undisputed the person who killed the victim did so in furtherance of the conspiracy. In *People v. Ware*

[footnote continued on next page]

36

it is impossible to determine whether all of the jurors found all of the overt acts true, or relied on aiding and abetting.

Based on the evidence, instructions, and argument by the People, it is impossible to determine upon what theory the jury relied in reaching its verdict. At least one juror could have been convinced that defendant was guilty of first degree murder based on the overt act that defendant transferred $2,500 to Crockett after the murder. Such conclusion did not necessarily mean that the juror also found the other overt acts true, or that they additionally concluded defendant aided and abetted the first degree murder. As such, we must reverse defendant's conviction of first degree murder and the lying in wait special circumstance.

## C.     RETRIAL ON REMAND

We must decide whether the prosecution may retry defendant on remand. If reversal is required for instructional error, but substantial evidence supports the verdict, double jeopardy does not bar retrial. (*People v. Hallock* (1989) 208 Cal.App.3d 595, 607; see also *People v. Hernandez* (2003) 30 Cal.4th 1, 6.) We briefly address the sufficiency of the evidence.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to

---

(2022) 14 Cal.5th 151, the court found sufficient evidence of the overt act of the murder based on the codefendant in the case being convicted of attempted murder. It found, "the attempted murder conviction of an alleged coconspirator in furtherance of the conspiracy is sufficient to show the overt act element has been satisfied." (*Id.* at p. 164.) Here, Crockett was tried separately.

determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Hin, supra,* 17 Cal.5th at p. 451.)

Substantial evidence supports that defendant either aided and abetted the first degree murder of Alicia, or entered into a conspiracy to commit her murder, and, as such, that a properly instructed jury could find defendant guilty of first degree murder and the special circumstance of lying in wait murder.

The evidence supporting defendant's guilt was strong. Defendant had instructed occupants of the Jasper Loop house that they were not to date anyone he had dated, or they would be killed. There also was sufficient evidence that defendant was the mastermind behind the shooting of Alicia. Defendant and Crockett exchanged numerous messages during the shooting, the park-n-ride incident, and the brandishing at Romero's home. Defendant had installed tracking devices in both cars belonging to Romero and Alicia, showing that he knew where they were located at all times. Crockett followed Alicia to her work in Dana Point on the day of the murder and there was no explanation for his being near her work on that day. There was evidence supporting that defendant provided the address to Crockett. There were numerous messages on the phone number shared by defendant and Crockett prior to Alicia's shooting regarding obtaining a gun, how much it would cost to "fuck up" a female and how to get rid of the gun. While it was not clear who sent the messages, Crockett or defendant, or if they were received by

them, as argued by the prosecutor, they were on the phone and it was reasonable defendant saw the messages.

Further, defendant sent messages to Crockett after the shooting, while Crockett fled to Las Vegas, but not once mentioned that Alicia, whom he considered a daughter, had been shot. Crockett was arrested with the same ammunition as was found at the scene of the shooting, and he and defendant discussed him cleaning out his car after it was impounded in a recorded jail call. This evidence strongly established that defendant aided and abetted the shooter, or was part of the conspiracy to kill Alicia.

## DISPOSITION

Defendant's conviction of first degree murder and the special circumstance of lying in wait is reversed. We conclude the principles of double jeopardy do not bar retrial in this case.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____

Acting P. J.

We concur:

CODRINGTON_____

J.

FIELDS_____

J.

39